UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

DAVID BRUNNER,

       Plaintiff,

v.                                                                            07-3189

NEIL WILLIAMSON,
TERRY DURR, and
ASSISTANT WARDEN STRAYER[1],

       Defendants.

### Case Management Order and Disposition of All Pending Matters

       This case proceeds on the following claims:

       1) The totality of conditions at the Jail violates or violated the plaintiff's 14th amendment due process rights;

       2) The difference in treatment between the block in which the plaintiff is/was housed and the "honor's block" violates Plaintiff's Fourteenth Amendment equal protection rights; and,

       3) The plaintiff's placement in a high risk cell amounted to punishment without due process in violation of his 14th amendment rights.

*Motions for Discovery (d/e's 32. 35)*

       Motion # 32 is moot with regards to the plaintiff's medical records, which have been provided to him.

       Remaining is the plaintiff's request for the housing records of all the blocks, showing the names and charges of the inmates/detainees and the block each is housed in. He seeks this information to show that there are inmates in the honors blocks with the same or similar charges as him (murder). that he is housed in the L block solely because he has been charged with murder, but. He maintains that, under the behavioral point system at the Jail, he should be in the honors block because he has had no major tickets. He argues that he has never received a major

---

[1]Defendants Sangamon County Jail, Cain, Powell, Loftus, Carry, Guy, Clemmins, Bueve, Kruger, Wallace, Hudgguns, Smith and Bennett were dismissed for failure to state a claim against them.

disciplinary ticket. He "feel[s he has] been deprived of privileges allowed to those whom should have the same security level as I do." He believes he should have a lower security classification, like other allegedly similarly situated inmates.

This claim is not before the court. The plaintiff's equal protection claim before the court is based the difference in walkman radio privileges between the L block and the honors' blocks. (Complaint #6):

> I feel as tho [sic] the Jail is discriminaiting [sic] against me due to my classification of being on L-Black. There are 3 honor Blocks in this Jail and on these blocks the Jail allows walkman radios. Non-honor blacks get radios confiscaited [sic] during shakedowns & we are told we can't have them because we are considered maximum security when in fact <u>All</u> blocks on the 3rd floor are classified as max. security.

(Complaint p. 5)(underline in original). He maintained that many jail guards agreed that radios should be allowed. In his Complaint the plaintiff seeks a change in Jail policy that allows radios on all the blocks. (Complaint p. 6, Relief Requested)("I would like to see that at least radios be allowed in all Jail Blocks"). He did not challenge his placement on L block, but rather the reduced privileges on L block as compared to the honors block. To allow him to add this claim after discovery closed and after a dispositive motion was filed would work unfair prejudice on the defendants and unduly and unnecessarily prolong this case. The information he seeks in his motions is not relevant to the claim before the Court: the difference in radio privileges between L block and the honors' blocks.[3] Accordingly, these motions will be denied.

---

[2] The court does not pass on the merits of the plaintiff's claim that he should be in the honors' dorm because others like him are. However, the court notes that the evidentiary burden of such an equal protection claim, a "class of one" claim, is high. A class of one claim begins with showing that others similarly situated were treated more favorably then the plaintiff. "Similarly situated" means "'identical [to the plaintiff] in all relevant respects.'" *Sellars v. City of Gary*, 453 F.3d 848, 850 (7th Cir. 2006)(quoted cite omitted). This is a heavy burden–"' plaintiff's evidence must be such that it allows a reasonable jury to "eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *RJB Properties, Inc.*, 468 F.3d 1005, 1009-10 (7th Cir. 2006)(citations omitted). Any rational basis will defeat the claim, even one different than the reason given at the time of the adverse event. *Id.*

[3] Even if this claim were a part of the case, the plaintiff's efforts to obtain the information were untimely. The plaintiff had ample time during discovery to try to obtain this information, but his submissions show that he did not try to obtain the information until after the close of discovery and after the defendants filed their summary judgment motion. (d/e 35, attachments). He does not explain the delay.

*Motion for Extension to Conduct Depositions (d/e 38)*

The plaintiff asks that discovery be reopened because he has recently learned that he should be permitted to take depositions. He asks the court to allow him to take depositions and to schedule those depositions.

Granting a plaintiff leave to proceed *in forma pauperis* does not mean that the plaintiff's entire costs of pursuing his or her suit are waived or subsidized. It means only that the plaintiff is not required to pay the filing fee up front and that the plaintiff does not have to pay for service on the defendants. Thus, the arrangement of and costs of depositions he wants to conduct would be his responsibility. In any event, an incarcerated plaintiff is necessarily limited to written discovery. Further, the plaintiff's attempts at discovery now are untimely. Accordingly, this motion will be denied.

*Motion for Summary Judgment (d/e 29)*

Based on its review of the memorandum in support of summary judgment, its accompanying exhibits, and upon the plaintiff's response (d/e 32), the court finds the following facts undisputed. Most of the facts below are taken verbatim from the defendants' motion for summary judgment, to the extent not sufficiently disputed by the plaintiff.

1. The plaintiff was booked into the Sangamon County Jail on April 30, 2006. He remains incarcerated there as a pretrial detainee on four counts of first degree murder. (Brunner Dep., p. 5).

2. The plaintiff spent the first few days in the medical unit due to his condition and then he was transferred to a "high risk" cell. (Complaint #1). This was because when the plaintiff first came into the Jail, he was strung out on drugs, had been up for 14 days straight smoking crack, and was reported to have made some suicidal statements to the detective investigating his case. (Brunner Dep., p. 8). The plaintiff is not challenging this initial placement in the high risk cell. He is only challenging his second placement in the high risk cell (discussed below). (Brunner Dep., p. 8, 13).

3. Defendant Terry Durr is currently employed as the Jail Superintendent for the Sangamon County Sheriff's Department (SCSD). He has been employed by the SCSD since October 28, 1992. He has been employed as the Jail Superintendent since January 31, 2005. (Durr Aff., ¶1).

4. As the Jail Superintendent, Durr is responsible to the overall operations of the Jail and is familiar with the booking procedures, clothing policy, layout of the cells, sleeping arrangements, shower policy, exercise policy, housing issues, grievance procedure, allowable property, cell classification, inmate privileges and commissary privileges. Durr reports directly to the Chief Deputy and Sheriff Neil Williamson. (Durr Aff., ¶2).

5. Defendant William Strayer is an Assistant Jail Superintendent at the Jail and reports directly to Defendant Durr.

6. Durr and Strayer have reviewed and are familiar with the allegations in the Complaint. (Durr Aff., ¶3; Strayer Aff., ¶3).

7. When booked into the Jail inmates are not allowed to wear their own under garments, out of concern over the spread of disease. Inmates can purchase items, including soap, undergarments, clothing and hygiene materials from the commissary. (Durr Aff., ¶4; Strayer Aff., ¶4).

8. The plaintiff's commissary records show that he received funds in his trust fund account on May 16, 2006, seventeen days after he was booked into the Jail (counting the day of booking). The plaintiff purchased undergarments the next day, on May 17, 2006. (Brunner Affidavit p. 1 (d/e 32)). Funds have been added to the plaintiff's prison account regularly since May 2006, which he has used to purchase items at the commissary.

9. Upon arrival, inmates are issued a jail uniform. (Durr Aff., ¶5; Strayer Aff., ¶5).

10. The defendants aver that the Jail policy is to regularly clean uniforms and that all inmates are issued a clean uniform upon arrival into the Jail. (Durr Aff., ¶7; Strayer Aff., ¶7). The plaintiff alleged in his Complaint that sometimes the uniforms are stained with menstrual blood from female inmates. He does not appear to dispute, however, that the uniforms are cleaned before being issued, despite the fact that some of the cleaned uniforms may still have stains even after cleaning. He also does not dispute that if a uniform is stained, an inmate can simply exchange the uniform on the spot and ask for a different one. (Durr Aff., ¶8; Strayer Aff., ¶8).

11. If an inmate is truly indigent, unisex underwear is available free of charge. (Strayer Aff., ¶7). In the past, Lt. Beckner provided Mr. Brunner unisex underwear. (Brunner Dep., p. 37). Mr. Brunner believes that the unisex underwear look like women's panties, and as a result, inmates such as himself will not put them on. (Brunner Dep., p. 37). Brunner avers, however, that he was not offered any unisex underwear when he was booked into the Jail in April 2006 or since then. (Brunner Aff. P. 1, d/e 32). He does not, however, link the failure to offer him unisex underwear to any of the defendants named in this complaint.

12. At all relevant times to this complaint, the practice at the Sangamon County Jail was to give all inmates one mattress upon which to sleep in their cells. (Durr Aff., ¶11; Strayer Aff., ¶11). The mattress is padded and is approximately three inches thick, consisting of a foam or cotton filling surrounded by a plastic or vinyl-type covering. (Durr Aff., ¶12; Strayer Aff., ¶12).

13. If more inmates are assigned to a cell than the number of beds contained in the cell, one or more of the inmates, by necessity, had to sleep on the floor. (Durr Aff., ¶15; Strayer Aff., ¶15).

14. All beds are made of concrete, the same substance of which the cell floors are made. (Durr Aff., ¶16; Strayer Aff., ¶16).

15. Regardless of where an inmate sleeps (i.e., the bed or the floor), the mattress for the bed is the same as that used by the inmate who sleeps on the floor. (Durr Aff., ¶17; Strayer Aff., ¶17).

16. Due to fluctuating inmate populations and space limitations, it was not an infrequent occurrence for two or more persons to be housed in a cell. (Durr Aff., ¶19; Strayer Aff., ¶19).

17. Inmates can and do exercise in their individual cells. (Durr Aff., ¶20; Strayer Aff., ¶20). There are no restrictions on inmates exercising in their cell so long as the exercise does not pose a safety or security risk or endanger the inmate or others. (Durr Aff., ¶21; Strayer Aff., ¶21).

18. Inmates are generally locked down from 2 p.m. to 4 p.m., 10:00 p.m. to 6:00 a.m. and 6:30 a.m. to 8:00 a.m. daily. (Durr Aff., ¶22; Strayer Aff., ¶22).

19. With the exception of the times above, inmates go to the day room and, according to the plaintiff, are locked out of their cells. (Durr Aff., ¶23; Strayer Aff., ¶23). Thus, the inmates spend two daily stints in the dayroom, each about 5 or 6 hours long. The day room is equipped with tables and chairs, television, books and games. (Durr Aff., ¶24; Strayer Aff., ¶24).

20. Inmates can and do perform various sorts of exercise and physical activity (such as push ups) in the day room. (Durr Aff., ¶25; Strayer Aff., ¶25). Inmates are generally allowed any reasonable physical movement in the day room so long as it does not pose a safety or security risk. (Durr Aff., ¶26; Strayer Aff., ¶26).

21. Jail policy is that inmates are allowed to go to the gymnasium for one hour per day, Monday through Friday. (Durr Aff., ¶29; Strayer Aff., ¶29). However, the plaintiff avers that gym is available only when an officer "feels like taking us. There are a lot of times when we don't see the gym for a week straight." (Brunner Aff. p. 8, d/e 32). He does not, however, link an individual officer's failure to follow policy to any of the named defendants here. The plaintiff also avers that there is an outside recreation area but no one is allowed access to it and that he has not been outside for fresh air or sun at any time. *Id.*

22. There are 12 cells on the L Block which can typically house up to 24 people.[4] For safety and security reasons, the Jail policy is that when an inmate exits his cell in the L Block, he must shut and lock the door. For safety and security reasons, inmates are not allowed to bring blankets out of their cells because they can be used as a weapon or to hide movement. (Durr Aff. ¶30; Strayer Aff., ¶30). The plaintiff asserts that he was told that the charges against him (murder) require his placement in L block per Jail policy.

23. There are approximately 16 chairs in L Block day room. (Durr Aff., ¶31; Strayer Aff., ¶31). The chairs are not always occupied. The plaintiff avers that L Block has generally housed the maximum 24 inmates most of the time, or has at least exceeded 16. (Brunner Dep., p. 27). He avers that he often could not find a seat and consequently had to either stand the entire time or sit on the concrete floor. Sitting on the floor, he maintains, caused an open sore on his tailbone that was treated with antibiotics in April and December 2007. He asserts that the sore

---

[4] The defendants say there are 16 cells, but the plaintiff says there are 12 cells.

5

has still not healed. Mr. Brunner admitted at his April 28, 2008 deposition that recently he has been able to get a seat at the table in the day room and that there were only 16 or 17 inmates on the L block at that time.

24. During Mr. Brunner's stay at the Jail, his cell occupancy was as follows:
        5/1/06 to 5/2/06:  Medical 2 cell
        5/2/06 to 5/12/06:  cell #I4 (booking, high risk)
        5/12/06 to 10/10/06 :  L Block (high-medium security)
        3/16/07 to 3/30/07:  (work release cell)
        3/30/07 to 5/30/07:  L Block
        5/30/07 to 6/1/07:  I-2 (booking, high risk)
        6/1/07 to 10/07:  L Block.
(Durr Aff., ¶ 34; Strayer Aff., ¶ 34).

25. The policy or practice for inmates in high risk cells was not to issue them soap for safety and security reasons. (Durr Aff., ¶35; Strayer Aff., ¶35). The defendants maintain that the inmates can ask guards to let them out of the cell to wash their hands. However, the plaintiff avers that the guards do not let inmates out to wash their hands.

26. Inmates in high risk cells have running water in their cells and can rinse their hands off any time albeit without soap.

27. The plaintiff did not receive any eating utensils when he was in a high risk cell. The defendants maintain that high risk inmates are given eating utensils if the food requires a utensil to be eaten. (Durr Aff., ¶37; Strayer Aff., ¶37). The plaintiff disputes this. However, he does not say what he was fed that would have required a utensil.

28. While in the L block, the plaintiff was not allowed to have a radio because that block is considered high-medium security. No inmates on other high-medium security blocks are allowed to have radios either. (Durr Aff., ¶39; Strayer Aff., ¶39). While on the L block, the plaintiff had a radio confiscated because he was in possession of it in violation of jail policy. (Durr Aff., ¶41; Strayer Aff., ¶41).

29. As the Superintendent and Assistant Superintendent, respectively, Durr and Strayer are familiar with the classification of cell blocks.

30. The honor dorms are located on the third floor and are the lowest security classification. Accordingly, inmates residing in the honor dorms enjoy privileges that L Block inmates do not, such as being allowed to possess a radio. (Strayer Aff., ¶42).

31. No inmates in the jail who are the same or higher security classification as L block are allowed to possess radios. (Durr Aff., ¶43; Strayer Aff., ¶43).

32. The plaintiff was placed in a high risk cell a second time, from approximately 5/30/07 to

6/1/07, based on another inmate's allegations that the plaintiff was eating paint chips. (Durr Aff., ¶44; Strayer Aff., ¶44). Defendant Strayer approved the order for that placement due to a report that officer Kirby had received from another inmate that the plaintiff was eating paint chips to make himself sick. The inmate had also told officer Kirby that Mr. Brunner wanted to get sick for lawsuit purposes. (See Strayer Aff., ¶ 45 and Exhibit B to Durr and Strayer Affidavits). Defendant Durr was not involved in the decision to place Plaintiff in high risk. (Durr Aff., ¶44).

33. Two days after being placed in "high risk," on June 1, 2007, Psychiatrist Dr. Maher, made the recommendation for plaintiff to be taken off high risk. Jail records indicate that this recommendation was immediately implemented. (Durr Aff., ¶45; Strayer Aff., ¶48 and Exhibit B to Durr and Strayer affidavits).

34. Mr. Brunner has had no conflicts with the sheriff. He has never spoken to the Sheriff regarding any of his complaints. (Brunner Dep., p. 47).

35. Durr did not respond directly to the plaintiff's grievances. The plaintiff believes his grievances were handed down to Strayer or Strayer's subordinates to handle. (Brunner Dep., p. 48).

36. Durr did not personally review or respond to any of plaintiff's grievances, nor did he speak to or otherwise communicate with Mr. Brunner regarding same. (Durr Aff., ¶46).

*Summary Judgment Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Summary judgment is the . . . moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e).

*Analysis*

I.  Conditions of Confinement

A pretrial detainee's claim falls under the due process clause of the Fourteenth Amendment, rather than under the Eighth Amendment. *Grieveson v. Anderson,* --- F.3d ----,

2008 WL 3823872 *6 (7th Cir. 2008)(pre-trial detainee is "not subject to punishment at all.")(*citing Brown v. Budz*, 398 F.3d 904, 910 (7th Cir.2005); *Guzman v. Sheahan*, 495 F.3d 852, 856 (7th Cir.2007). However, "there is 'little practical difference between the two standards.'" *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001), *citing Weiss v. Cooley*, 230 F.2d 1027 (7th Cir. 2000); *Grieveson*, — F.3d —, 2008 WL 3823872 * 6. Like the Eighth Amendment, the plaintiff must pass an objective and subjective test. The deprivation must be sufficiently serious to arise to "punishment," and the defendants must have acted with a "sufficiently culpable state of mind." *Id.* at 473. Prison conditions do not violate the Constitution unless they "result in the denial of the minimal civilized measure of life's necessities." *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999)(quoted cite omitted). "'[E]xtreme deprivations are required to make out a conditions-of-confinement claim.'" *Id., quoting Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The totality of the conditions are examined. *See Demallory v. Cullen*, 855 F.2d 442, 445 (7th Cir.1988).

In sum, as discussed in more detail below, the plaintiff has not presented enough evidence to allow a reasonable inference that the Jail conditions which he has personally experienced are objectively serious enough to amount to constitutional violations. Summary judgment is therefore mandated for the defendants on this claim.

A. Mattress on Floor by Toilet

The plaintiff does not take issue with the fact that he had to sleep on the floor on a mattress. It was the proximity of his mattress to the toilet that he challenge. For eight months he had to sleep on the mattress on the floor, below toilet level and about two feet from the toilet, where the foot of his mattress was splashed with urine when his cellmate used the toilet during the night. (d/e 32, p. 8; Complaint #3). He contends that an additional bunk should be mounted on the walls in L block to allow both cellmates to sleep off the floor. He also contends that he should not have had to get up and move everytime his cellmate wanted to use the toilet during the night, just to avoid the urine splashing.

The court does not believe that inadvertent drops of urine splashing onto the plaintiff's mattress is a serious enough condition to violate the federal constitution. It is sub-optimal and certainly unpleasant, but not the kind of extreme deprivation required to garner the constitution's attention. Further, the plaintiff could have avoided the splashing by moving, and he also could have asked his cellmate to direct the urine stream to minimize splashing. This is the kind of inevitable annoyance resulting from housing two inmates in a cell designed for one, but it is not the stuff of a constitutional claim.

B. High Risk Cell: No Eating Utensils and No soap to Wash Hands before Eating

The plaintiff spent 11 days in the high risk cell after his booking, and then, later, another 3 days because of an inmate's false allegations that the plaintiff had been eating paint chips. The plaintiff was not allowed to use soap to wash his hands before eating and was not provided an eating utensil for these 14 days. He does not dispute, however, that he was able to rinse his

8

hands off in the running water in the cell. He counters that rinsing with water is not enough to sanitize his hands for eating.

The court again does not believe that this is a serious enough condition to violate the constitution. It is certainly preferable to wash one's hands with soap and water before meals, rather than just water, but constitutionally required? The court does not think so. Further, the situation was relatively short in duration–one period of 11 days and one period of 3 days. As to the eating utensils, the plaintiff gives no information of what kind of food was served, and the defendants assert legitimate security reasons for not handing out utensils to inmates in high risk cells as a matter of course unless the food required it. The plaintiff seems to assert that he should have been given a utensil no matter what was served. (d/e 32, p. 4)(placement in high risk cell "<u>does not</u> excuse being denied an eating utensal [sic] <u>at all times</u>, which will be proved . . . ., wheather [sic] the food required it or not.")(underline in original). The court disagrees. Would it be unconstitutional to hold back on the eating utensils if hamburgers and french fries are served? The court thinks not. It is the plaintiff's burden to show that the lack of an eating utensil for 14 days amounted to an extreme deprivation for him. He has not done so.

C. Not enough Chairs in Common Area/Sitting on Concrete Floor

The plaintiff asserts that he suffered a sore on his tailbone caused by sitting on the concrete floor in the dayroom because there were not enough chairs. He asserts that the sore has still not healed, though he was prescribed antibiotics for it twice in 2007. His medical records do show the prescription of antibiotics twice in 2007, but they do not show why they were dispensed. Nevertheless, the court accepts as true the plaintiff's statement that he has a recalcitrant sore on his tailbone. But the court cannot accept as evidence the plaintiff's speculation that it was caused by sitting on concrete. He also alludes to a "hip problem" (Brunner Dep. p.22) but that is not substantiated.

The plaintiff is too vague about how much time he actually spent sitting on the floor to infer an extreme deprivation. His claim at heart seems to be that every inmate should have a chair. That may be so, but not having a chair for every inmate does not prove that the plaintiff suffered a constitutional deprivation. For example, it is clear that the plaintiff was not forced to sit on the floor the entire time or in fact at all. He had the option of standing, walking, exercising, leaning, etc. He does not address this. Further, he does not address how often he *was* able to sit in a chair. He does not dispute that the chairs were not always occupied, and he testified in his deposition that he did not tarry in getting to the dayroom because he liked to get a chair. His testimony implies that he could not get a chair only *if* he was late in coming out of his cell. (Brunner Dep. P. 22). The inference arises that he was able to get a chair a significant amount of the time. Further, he testified that he sometimes sat on towels and blankets (some guards looked the other way). In short, the plaintiff has not shown that the lack of chairs in the dayroom caused him a constitutional deprivation.

D. No Underwear for 18-19 days

9

For purposes of this order, the court takes the plaintiff's version that he was not offered unisex underwear upon booking. Yet, the plaintiff does not say he *asked* for unisex underwear to tide him over until he had sufficient funds to buy better quality underwear from the commissary. In fact, the plaintiff seems to assert that he would not wear the unisex underwear even if it had been offered. (Brunner Aff. p. 7). In any event, the duration of this deprivation was relatively short and the plaintiff was given a clean uniform to wear (see below). Further, there is no evidence of deliberate indifference. The plaintiff admits that Lt. Beckner responded to the plaintiff's grievance by telling him that the jail was in the process of purchasing underwear, but that "the last time we did this inmates wore them for do-rags." (Complaint #5). This response shows a lack of deliberate indifference, at least on Beckner's part. Finally, even if Beckner had been deliberately indifferent, the plaintiff offers no evidentiary link to the named defendants here. "The doctrine of *respondeat superior* can not be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). Only those who are personally responsible for the violation are liable. *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007).

    E. Soiled Uniforms

The plaintiff does not dispute that inmates receive cleaned uniforms at booking and that they can exchange stained uniforms on the spot. Accordingly, this is no longer an issue.

II. Equal Protection Claim

    1. No Radios on L Block as Compared to Honors' Block

"In the prison context, the Equal Protection Clause of the Fourteenth Amendment requires inmates to be treated equally, unless unequal treatment bears a rational relation to a legitimate penal interest." *May v. Sheahan*, 226 F.3d 876, 882 (7th Cir. 2000)(*citations omitted*).

The plaintiff does not dispute that L block is classified as high-medium security and that honors blocks are classified as low security.[5] He also does not dispute that no blocks that are classified as high-medium security or higher are allowed radios.

The difference in security classification between the L block and the honors' blocks means that the inmates in the respective cell blocks are not similarly situated. *City of Cleburne v. Cleburne Living .Ctr.,* 473 U.S. 432, 439 (1985)( An equal protection violation occurs when the government treats someone differently than another who is similarly situated.). Inmates in the honors blocks are in a low security block. Inmates in L block are in a high-medium security block. The difference in radio privileges between a high-medium security block and a low

---

[5]The plaintiff did allege in his complaint that all the blocks on the third floor are maximum security, but he does not dispute that the honors block is on the third floor and is not maximum security.

security block is rationally related to a legitimate penal interest–that of encouraging and rewarding good behavior. As discussed above, the plaintiff's claim challenging his *placement* in a high-medium security block is not before the court.

III. Second Placement in High Risk Cell

The plaintiff was put back in the high risk cell for three days based on an inmate's false allegations that the plaintiff had been eating paint chips to get sick so that he could file a lawsuit. Yet the plaintiff has no evidence that Defendant Strayer, who made the decision, knew that the allegations were false. Given the plaintiff's original time in high risk for suicidal statements, Strayer's placement of the plaintiff in high risk the second time until a psychiatrist could see him was a reasonable response to protect the plaintiff from hurting himself. *Higgs v. Carver*, 286 F.3d 437 (7th Cir. 2002)(citations omitted)(no due process required if pretrial detainee placed in segregation for reasons other than punishment, including protection of detainee).[6] There is no evidence that the plaintiff was put in the high risk cell for punishment–he was put there for his own health and safety (though it turned out doing so was unnecessary).

IV. Exercise/Access to Outside

The plaintiff's Complaint did not complain about any lack of opportunity to exercise and he does not do so now. Thus, there is no lack of exercise claim before the court, but even if there was, summary judgment would be mandated for the defendants. In any event, he does not dispute that he can exercise in the day room. He also does not dispute that the policy is for one hour of gym per week, though he asserts that gym access is subject to the guards' whims.[7]

In his response to the summary judgment motion, the plaintiff avers that there is an outside recreation area but that no one is allowed to use it. He says that has not been outside for fresh air or sun at any time during his over two years of incarceration. This claim is not before the court–it was not mentioned in the Complaint or at anytime before the plaintiff's response to the summary judgment motion. The defendants therefore had no cause to address outdoor opportunities. Allowing the plaintiff to tack on this claim now would unfairly prejudice the defendants and unduly prolong the case. The court wishes to make clear, however, that it expressly declines to address the merits this claim.

IT IS THEREFORE ORDERED:

---

[6]The court assumes for purposes of this order that the restrictions attendant to the high risk cell might be viewed as "punishment" if placement was for disciplinary reasons.

[7]He is not specific about any gym denials and has no evidence that any of the defendants were aware of those denials, much less personally responsible for them.

1) The plaintiff's motions for discovery (d/e's 32, 35) and motion to reopen discovery to take depositions (d/e 38) are denied.

2) Defendants' motion to strike is denied (d/e 36).

3) Defendants' motion for summary judgment is granted (d/e 29). The clerk is directed to entered judgment in favor of the defendants and against the plaintiff.

4) Defendants' motion to dismiss is denied as moot (d/e 16).

5) This case is terminated, with the parties to bear their own costs.

6) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.

Enter this __26th_ day of __August_ 2008.

        **s\Harold A. Baker**
_____
        HAROLD A. BAKER
       UNITED STATES DISTRICT JUDGE